FILED
01/14/2025
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2024

## STATE OF TENNESSEE v. CHRISTOPHER HINSON

**Appeal from the Circuit Court for Carroll County**
No. 22-CR-25      Bruce Irwin Griffey, Judge

_____

**No. W2024-00236-CCA-R3-CD**

_____

Defendant, Christopher Hinson, appeals the trial court's revocation of his probation and reinstatement of his original sentence in confinement. Defendant argues that the trial court erred when it ordered him to serve his sentence because it failed to consider any consequences other than a full revocation and placed no findings or reasons for its decision on the record. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JILL BARTEE AYERS, J., joined.

Kendall Stivers Jones (on appeal), Assistant Public Defender—Appellate Division of the Tennessee District Public Defender's Conference; Tas Gardner, District Public Defender; and Timothy D. Nanney (at trial), Assistant District Public Defender, for the appellant, Christopher Hinson.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Neil Thompson, District Attorney General; and R. Adam Jowers, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

On January 3, 2022, the Carroll County Grand Jury issued an indictment charging Defendant with the following offenses:

| Count | Offense | Classification |
|-------|---------|----------------|
| 1 | Domestic Assault | Class A misdemeanor |
| 2 | Violation of a No Contact Order | Class A misdemeanor |
| 3 | Aggravated Stalking | Class E felony |
| 4 | Aggravated Burglary | Class C felony |
| 5 | Violation of a No Contact Order | Class A misdemeanor |
| 6 | Aggravated Stalking | Class E felony |
| 7 | Aggravated Burglary | Class C felony |
| 8 | Violation of a No Contact Order | Class A misdemeanor |
| 9 | Violation of a No Contact Order | Class A misdemeanor |
| 10 | Violation of a No Contact Order | Class A misdemeanor |

On May 15, 2023, Defendant entered "best interest" guilty pleas, pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), to domestic assault in count 1 and to the lesser-included offense of attempted aggravated burglary in count 4. Although a transcript of the guilty plea submission hearing is not included in the record on appeal, the indictment alleged in count 1 that, on or about September 28, 2021, Defendant "did intentionally and knowingly cause his wife, Sherrie Hinson, to suffer bodily injury" and that Defendant was previously convicted of domestic assault on May 26, 2016. Additionally, the indictment alleged in count 4 that, on or about September 28, 2021, Defendant "did, without the effective consent of the property owner, intentionally or knowingly enter the habitation of Sherrie Hinson . . . with the intent to commit an assault." Pursuant to a plea agreement, the trial court sentenced Defendant to concurrent terms of 11 months and 29 days at 75% service for domestic assault and 6 years at 35% service for attempted aggravated burglary, as a Range II offender. The court suspended Defendant's sentence to time served and placed him on supervised probation. As part of the agreement, the trial court ordered Defendant to have no contact with Mrs. Hinson or her property, and Defendant agreed to grant Mrs. Hinson an order of protection that was "renewable and extendable" if there was ever any contact with Mrs. Hinson. The State entered a nolle prosequi as to the remaining counts of the indictment.

On June 30, 2023, a violation of probation warrant was issued for Defendant's arrest. The warrant alleged that Defendant had violated Rule 10 of the Rules of Probation by failing to observe the special condition imposed by the trial court that Defendant have no contact with the victim or the victim's property.

At a subsequent revocation hearing, Maria Gregory testified that she was a probation officer with the Tennessee Department of Probation and Parole and that she was assigned to supervise Defendant after he was placed on probation for domestic assault and attempted aggravated burglary on May 15, 2023. Ms. Gregory stated that, as a special condition of Defendant's six-year probationary sentence, the trial court ordered that Defendant have no

contact with the victim of those offenses, Mrs. Hinson. Ms. Gregory testified that she explained to Defendant he was to abide by the special condition under Rule 10 of the Rules of Probation.

Ms. Gregory testified that Defendant met with her for his "initial intake" but that he did not report to her in person thereafter. She explained that, on June 15, 2023, she filed a violation report after she received information that Defendant "had been having contact with the victim[.]" She agreed that the violation report contained allegations that Defendant came by Mrs. Hinson's residence searching for her and that Defendant sent multiple messages to Mrs. Hinson.

Ms. Gregory explained that this had been the first violation report she had filed in Defendant's case and that he had not failed any drug screens. She said that Defendant had provided her with verification of his employment, that his job had been located in Madison County, and that Defendant had requested that his probation be transferred to Madison County. Ms. Gregory explained, however, that the transfer request was never approved due to her filing of the violation report. Ms. Gregory recalled that Defendant reported by phone at least one time after she filed the violation report.

Sherry Hinson testified that she had been aware of the special condition of Defendant's sentence that he have no contact with her or her property. She said, however, that, shortly after the imposition of his sentence, Defendant began violating the no contact order. She testified that Defendant "reached out to my brother, my sisters, my sons on Facebook, trying to find where I was." Mrs. Hinson said that she had a video from May 25, 2023, when Defendant drove past her house; she explained, "He went to my neighbor's house across the street. Got out of his truck. Walked up to the door and started asking her questions about me. Wanting to know where I was." Mrs. Hinson said that she was at work on the day when Defendant drove past her house and spoke to her neighbor.

When asked specifically what the video from that day showed, Mrs. Hinson stated:

Well, [Defendant] drove past my house real close. I mean, my house was like three (3) foot from the road.

. . . .

And he drove by real slow. Just looking at everything. Scoping it out, and then he c[a]me back up the road, and my house is here, and he pulled up to the stop sign, and c[a]me across the street diagonally to my friend[']s house, and got out of the truck, and walked up on her porch.

. . . .

And when he left there, he went down the street to my brother[']s.

. . . .

And he called me.

Mrs. Hinson also testified that, after he was sentenced, Defendant began contacting her by phone and Facebook Messenger "[a]ll hours" of the night and day, including while she was at work. She explained that, even though she had "blocked" Defendant on Facebook, he made a new account under the name "Chris Hinson" and that he "didn't hide the fact that he was sending the messages." Mrs. Hinson said that Defendant had a picture of himself on the new Facebook page and that he wrote in messages that "he wanted to see the dogs" and that he saw her car at the bank, "[l]ike he was following [her] around."

Mrs. Hinson identified copies of the Facebook messages sent to her in the first week of June 2023. She testified that, in one message, Defendant said, "I guess you sold the '09 like everything else. That was my second car." Mrs. Hinson testified, "And I did sell it and he noticed that it was gone from the backyard. So that means he was watching everything I was doing." Mrs. Hinson testified that some of the messages contained unique information that Defendant would know.

Mrs. Hinson identified another Facebook message sent to her that read, "I know what is going on. Roy done it." She explained that "Roy" was Defendant's "drug dealer in the trailer park in Jackson." Mrs. Hinson then identified a screenshot of her cell phone that she said showed Defendant's attempt to call her through Facebook Messenger in June 2023; she said that she did not answer the call.

On cross-examination, Mrs. Hinson said that she was certain Defendant made the new Facebook page using the name "Chris Hinson" because of the content of the messages from the account. She said that she had not received any more messages or contact from Defendant following his arrest on the violation warrant.

At the conclusion of the hearing, the State requested that the trial court fully revoke Defendant's probation. Defense counsel requested that the court allow Defendant "to go into a recovery program" at a rehabilitation facility. Defense counsel explained that Defendant had filed an application for a program called "Orthodox" and asked the court to "consider a partial revocation allowing [Defendant] . . . to complete that program." Counsel argued, "I think if we do that, maybe [Defendant] will get his life together and there won't be any more issues."

The trial court accredited Mrs. Hinson's testimony and found by a preponderance of the evidence that Defendant had violated the terms and conditions of his probation. Specifically, the court found that Defendant was under a no contact order with Mrs. Hinson as a special condition of his plea agreement and that Defendant violated this special condition "by contacting the victim by email and [by] sending messages via Facebook messenger" and by going to Mrs. Hinson's residence.

The trial court acknowledged the two-step consideration set out in *State v. Dagnan*, 641 S.W.3d 751 (Tenn. 2022), and found that the "appropriate consequence" for the violation was revocation of Defendant's probation and the imposition of his "6-year sentence in custody as it was originally entered." From the bench, the court explained its reasoning, as follows:

> The [c]ourt agrees with the State due to the recent nature of the sentence in [Defendant's] case, and the recent violation, very close in time, that [Defendant] is incapable of conforming his conduct consistent with the [c]ourt's order in staying away from the victim in this case, as he was instructed to and ordered to do.

> The [c]ourt finds that it would undermine the seriousness of the offense, and the seriousness of obeying the [c]ourt's order, particularly in cases where you have a victim, to do anything other than to fully revoke [Defendant].

This timely appeal follows.

## II. Analysis

Defendant contends that the trial court erred by failing to consider any alternative to fully revoking his probation and ordering incarceration and by failing to place any meaningful findings or reasons for its decision on the record. The State responds that the trial court properly revoked Defendant's probation and placed his sentence into effect. We agree with the State.

### Standard of Review

If a trial court "places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record[,]" this court's standard of review is abuse of discretion with a presumption of reasonableness. *Dagnan*, 641 S.W.3d at 759. We will not disturb the trial court's ruling on appeal absent an abuse of discretion. *State v. Shaffer*, 45 S.W.3d 553, 554-55 (Tenn. 2001) (citing *State v. Harkins*, 811 S.W.2d 79, 82 (Tenn.

- 5 -

1991)).  To establish an abuse of discretion, a defendant must show that there is "no substantial evidence" in the record to support the trial court's determination that a violation of probation has occurred.  *Id*. at 554.  When the trial court fails to place its reasoning for a revocation decision on the record, an "appellate court may conduct a de novo review if the record is sufficiently developed for the court to do so, or the appellate court may remand the case to the trial court to make such findings."  *Dagnan*, 641 S.W.3d at 759.

## Decision to Revoke Probation

Probation revocation decisions involve "a two-step consideration on the part of the trial court."  *Id*. at 757.  The trial court must first determine whether to revoke probation.  *Id*.  Upon a finding by a preponderance of the evidence that a defendant has violated a condition of his or her probation, a trial court may revoke probation.  Tenn. Code Ann. § 40-35-311(d)(1) (2023); *State v. Kendrick*, 178 S.W.3d 734, 738 (Tenn. Crim. App. 2005) (citing Tenn. Code Ann. §§ 40-35-310, -311).  The decision to revoke probation and the decision as to the proper consequence of revocation are "two distinct discretionary decisions."  *Dagnan*, 641 S.W.3d at 757.  These distinct decisions do not, however, necessitate a separate hearing.  *Id*.

In this case, we conclude that the trial court, based upon the evidence presented at the revocation hearing, placed sufficient findings and the reasons for its decision to revoke Defendant's probation on the record.  We, therefore, review the trial court's decision to revoke Defendant's probation under an abuse of discretion standard with a presumption of reasonableness.  *Id*. at 759.  To overcome that presumption, Defendant must show that there is "no substantial evidence" in the record to support the trial court's determination that a violation of probation has occurred.  *Shaffer*, 45 S.W.3d at 554.  Defendant has not done so.

## Consequences upon Revocation of Probation

Once a trial court determines that a defendant's probation should be revoked, the court must then "determine the appropriate consequence upon revocation."  *Dagnan*, 641 S.W.3d at 757.  The consequence may include: (1) confinement; (2) execution of the sentence as originally entered; (3) return of a defendant to probation on modified conditions; or (4) extension of a defendant's probationary period by up to two years.  *State v. Brawner*, No. W2013-01144-CCA-R3-CD, 2014 WL 465743, at *2 (Tenn. Crim. App. Feb. 4, 2014) (citing Tenn. Code Ann. §§ 40-35-308(a), -308(c), -310, -311(e); *State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999)).  "Relevant considerations might be, but are certainly not limited to, . . . the number of revocations, the seriousness of the violation, the defendant's criminal history, and the defendant's character."  *Dagnan*, 641 S.W.3d at 759 n.5.

Here, we conclude that the trial court placed sufficient findings and the reasons for its decision on the record; therefore, we review the court's decision to fully revoke Defendant's probation under an abuse of discretion standard with a presumption of reasonableness. *Id*. at 759. In determining the appropriate consequence upon revocation, the trial court found that Defendant was "incapable of conforming his conduct" to the court's order to stay away from Mrs. Hinson and her property, explaining that Defendant violated this special condition of his probation "very close in time" after he was sentenced. The court further found "to do anything other than to fully revoke" Defendant's probation would undermine the seriousness of the violation and the "seriousness of obeying the [c]ourt's order, particularly in cases where you have a victim[.]" These findings demonstrate that the trial court considered consequences other than full revocation, despite Defendant's claim to the contrary. Moreover, Defendant's history of refusing to comply with no contact orders, the seriousness of the violation, and the risk to the victim were all relevant matters for the court to consider upon deciding the appropriate consequence of the revocation. *See id*. Defendant has not shown that the court abused its discretion, and he is not entitled to relief.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE